================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 115
Robert R. Burton et al.,
                    Appellants,
            v.
New York State Department of
Taxation and Finance et al.,
                    Respondents.

            Kenneth I. Moore, for appellants.
            Judith N. Vale, for respondents.

RIVERA, J.:

        Plaintiffs, nonresident shareholders in an S

corporation, challenge under New York State Constitution Article

16, § 3 a tax imposed on their pro rata share of gains from the

sale of the corporation's stock.  We conclude that there is no

constitutional bar to taxation of a nonresident's New York-source

- 1 -

income earned from a stock sale, and therefore affirm.

I.

The facts are not in dispute.  Plaintiffs are several nonresident former owners and shareholders of JBS Sports, Inc. (JBS), a Tennessee business organized as an S corporation for federal and New York State tax purposes.  An S corporation is structured so that its corporate income, losses, deductions, and credits pass through to its shareholders, based on their individual percentage ownership in the corporation (26 USC § 1366; Tax Law §§ 617 [a] and 632 [a] [2]; 1 Hellerstein and Hellerstein, State Taxation 20.08 [2] [a] [iii] [3d ed. 2015]). The shareholders, in turn, report their pro rata share of the income and losses on their personal income tax returns in accordance with federal and state tax laws, and are assessed taxes at their individual tax rates (see 26 USC § 1366; Tax Law §§ 617 [a] and 632 [a] [2]).  Thus, the corporation does not pay corporate income taxes and avoids double taxation on both the corporation and the shareholders (see Matter of Smathers, 19 Misc 3d 337, 343 [Sur Ct 2008]).  Hence, the terms "pass through" and "flow through" income are used to describe the income itself, as well as the movement of income from the corporation to shareholders for tax purposes (see e.g. 26 USC § 1366).

In 2007, plaintiffs sold their JBS stock to Yahoo, Inc., and JBS and Yahoo decided to treat this transaction as a "deemed asset sale" for tax purposes under the Internal Revenue

Code (see 26 USC § 338 [h] [10]).  Deemed asset treatment is not automatic or mandated by statute, but instead requires a voluntary election by both the seller and purchaser, respectively JBS and Yahoo, to treat the transaction as an asset sale (see 26 USC § 338 [h] [10]; 26 CFR § 1.338 [h] [10] - 1 [c] [3]; 26 ALR 6th 219 § 2).  Thus, plaintiffs freely chose to proceed with the JBS stock transfer as a deemed asset single-transaction sale, presumptively aware of the tax consequences of their choice.

A deemed asset sale provides counter-balanced advantages and disadvantages for purchaser and seller.  On one side of the equation, the deemed asset sale makes possible significant future tax benefits to the purchaser because the assets are treated as sold at fair market value and the assets obtain a "stepped up," rather than a carryover, basis for the purchaser's future depreciation and amortization deductions (see 26 ALR 6th 219 § 2; 26 USC § 338 [h] [10]).  On the other side, the deemed asset sale may result in negative tax consequences for the corporate seller shareholders, who are responsible for personal taxes on their share of the gains.  However, even this can be offset by an agreement to a higher purchase price (see Heather M. Field, Binding Choices: Tax Elections & Federal/State Conformity, 32 Va Tax Rev 527, 583 [2013]).

As a result of the JBS stock transaction, JBS realized over $88 million in gains.  The JBS earnings then passed through to plaintiffs as shareholders (see 26 USC § 1366 [b]; Tax Law §§ 617 [a], [b], 632 [e] [2], and 660).  JBS reported these

corporate gains and the amount passed to plaintiffs as part of its federal tax return, but excluded the amount distributed to plaintiffs from its 2007 New York S corporation franchise tax return.  For their part, plaintiffs reported and paid federal taxes for the 2007 tax year on their respective shares of the asset sale income, as required by federal law (see 26 USC § 1366), but did not report or pay any New York State taxes associated with the sale.

Based on the results of a subsequent audit, defendant New York State Department of Taxation and Finance assessed $167,000 in state income taxes on plaintiffs' JBS transaction gains, relying on Tax Law § 632 (a) (2), which was amended in 2010 to provide, in relevant part, that "any gain recognized on [a] deemed asset sale for federal income tax purposes will be treated as New York source income."  Plaintiffs paid the taxes and thereafter demanded refunds, claiming that their corporate-derived income was obtained from the sale of JBS stock, which is considered intangible personal property and nontaxable.

After defendant rejected the refund demands, plaintiffs filed the instant declaratory judgment action against defendant and the Commissioner of the New York State Department of Taxation and Finance, challenging the tax as unconstitutional.[1]  Supreme

---

[1] During the pendency of the matter before Supreme Court plaintiffs abandoned their challenge to the retroactive application of Tax Law 632 § (a) (2).  We reject just such a challenge and uphold the retroactivity of the statute in Caprio v New York State Dept. of Taxation and Finance (___ NY3d ___, [2015] [decided herewith]).

Court denied plaintiffs' motion for summary judgment, granted

defendants' motion for summary judgment, and declared that the

statute "is constitutional" (see Burton v New York State Dept. of

Taxation & Fin., 43 Misc 3d 316, 319 [Sup Ct, Albany County

2014]).  Supreme Court noted that plaintiffs could not complain

because they had elected to treat the JBS transaction as a deemed

asset sale under federal income tax law (see id. at 318-319). We

retained jurisdiction over plaintiffs' direct appeal under CPLR

5601 (b) (2),[2] and now affirm.


                              II.

        Plaintiffs allege that Article 16, § 3 of the New York

Constitution absolutely precludes taxation of gains from the sale

of a nonresident's intangible personal property, in this case JBS

stock.  Plaintiffs therefore contend that as nonresident

shareholders they are immune from income taxation on their pass-

through pro rata shares of the JBS transaction earnings.  Hence,

plaintiffs argue that Tax Law § 632 (a) (2), as amended in 2010,

is unconstitutional to the extent it directly permits taxation of

nonresidents' income derived from the Internal Revenue Code (IRC)

§ 338 (h) (10) deemed asset sale.

        Defendants respond that Article 16, § 3 does not apply

---

        [2] Under CPLR 5601 (b) (2) "[a]n appeal may be taken to the
court of appeals as of right . . . from a judgment of a court of
record of original instance which finally determines an action
where the only question involved on the appeal is the validity of
a statutory provision of the state or the United States under the
constitution of the state or of the United States."

to plaintiffs' flow-through income realized from the sale of JBS corporate assets because the constitutional prohibition relied upon by plaintiffs applies to location-based taxes on intangible personal property domiciled outside of New York State. Alternatively, defendants alleged that plaintiffs waived any challenge to the tax by electing to treat the transaction as a deemed asset sale under IRC § 338 (h) (10).

As a preliminary matter, there is no question that New York State's Tax Law, including Tax Law § 632 (a) (2), as amended in 2010, contemplates the taxes that defendants assessed on the New York-source portion of plaintiffs' deemed asset sale gains. That conclusion is obvious from the applicable state and federal statutes, and is not seriously disputed by the parties.

Turning to the constitutionality of the assessment, we first recognize as a foundational tenet of our state tax law that New York seeks to achieve a certain amount of parallel treatment of state and federal taxation (see Tax Law §§ 617 [b], 632 [e] [2], and 660 [a]). New York S Corporation shareholders must report for state income tax purposes the same "income, loss, deduction and reductions . . . which are taken into account for federal income tax purposes" (Tax Law § 660 [a]). Furthermore, under federal and state law, deemed asset flow-through income is taxed based on the character of the income when earned by the corporation, meaning the income is treated as coming from the same source as received by the corporation (26 USC § 1366 [b]; Tax Law §§ 617 [a], [b] and 632 [e] [2]; see Hellerstein, State

Taxation, at 20.08 [2] [b] [iii] ["the source of a shareholder's pro rata share of S corporation income is first characterized by reference to corporate income-producing activities under Section 1366 (b) of the Internal Revenue Code, and then, as characterized, is sourced to locations according to the rule that applies to that type of income"], citing <u>Valentino v Franchise Tax Bd.</u>, 342 Cal Rptr 2d 304, 309 [4th Dist. 2001]).  Gains passed to the S corporation shareholders retain "the same character" for state income tax purposes as held for federal income tax purposes (Tax Law §§ 617 [b] and 632 [e] [2]).  Thus, if the corporation's income source is located in New York, it is taxable to the extent allowed under New York law.  For example, a nonresident's pass-through income is taxed based on the percentage of the income "derived from or connected with New York sources" (Tax Law § 631).  In contrast, the entirety of a New York resident's pass-through income is taxable (Tax Law § 617 [a]).

        Section 631 (a) (1) (B) further provides that nonresidents are subject to tax on income "derived from or connected with New York sources," such as income derived from an S corporation (Tax Law § 631 [a] [1] [B]).  Moreover, New York source income includes "dividends, interests, and gains from the disposition of intangible property" only if that intangible property is "employed in a business carried on in this state" (Tax Law § 631 [b] [2]).

        Tax Law § 632 (a) (2), as amended in 2010, includes as

New York source income any gains from a deemed asset sale under

IRC § 338 (h) (10).  That section provides, in relevant part:

> "[I]f the shareholders of the S corporation
> have made an election under section
> 338(h)(10) of the Internal Revenue Code, then
> any gain recognized on the deemed asset sale
> for federal income tax purposes will be
> treated as New York source income allocated
> in a manner consistent with the applicable
> methods and rules for allocation under
> article nine-A of this chapter in the year
> that the shareholder made the section
> 338(h)(10) election"

(Tax Law § 632 [a] [2]).

In accordance with these provisions, defendants treated

plaintiffs' gains from the JBS deemed asset sale as New York-

source income, and assessed taxes in proportion to the JBS income

derived from New York sources, which defendants calculated to be

13% of its total corporate income (see Tax Law §§ 617 [a], 631

[a] [1] [B], and 632 [a] [2]).  This assessment is wholly in line

with the statutory scheme, and absent a superior legal

restriction on our state's taxation of plaintiffs' pass-through

income, plaintiffs are without grounds to demand a refund.

Plaintiffs claim that a constitutional bar to the tax

is found Article 16, § 3 of the New York Constitution.  That

provisions states,

> "<u>Moneys, credits, securities and other
> intangible personal property within the state
> not employed in carrying on any business
> therein by the owner shall be deemed to be
> located at the domicile of the owner for
> purposes of taxation,</u> and, if held in trust,
> shall not be deemed to be located in this
> state for purposes of taxation because of the
> trustee being domiciled in this state,
> provided that if no other state has

> jurisdiction to subject such property held in trust to death taxation, it may be deemed property having a taxable situs within this state for purposes of death taxation. <u>Intangible personal property shall not be taxed ad valorem nor shall any excise tax be levied solely because of the ownership or possession thereof, except that the income therefrom may be taken into consideration in computing any excise tax measured by income generally. Undistributed profits shall not be taxed</u>"

(NY Const art. XVI, § 3 [emphasis added]).

"In construing the language of the Constitution, as in construing the language of a statute, the courts . . . give to the language used its ordinary meaning" (<u>Matter of Carey v Morton</u>, 297 NY 361, 366 [1948], citing <u>Matter of Sherill v O'Brien</u>, 188 NY 185, 207 [1907]).  As is obvious from the language of Article 16, § 3, there is no express prohibition on income taxation of a nonresident's intangible personal property. Nevertheless, plaintiffs contend such a prohibition is the logical consequence of the situs-rule adopted in the first sentence of section three.  In other words, plaintiffs argue that defendants must treat any income generated by the stock as nontaxable because New York's constitution requires a nonresident's intangible personal property, not employed in carrying on business in New York, be treated as domiciled outside of the state.

This view is unsupported by the plain language of Article 16, § 3, and misconstrues the constitutional prohibition. Plaintiffs assume that according an out-of-state domicile to a nonresident's intangible property, such as stocks, insulates the

nonresident shareholder from all types of taxes for all purposes. There is no textual support for such an expansive interpretation of Article 16, § 3. In fact, this Court has been careful to avoid overextending the application of section three beyond the obvious meaning of its text, purpose and history (see Ampco Printing-Advertisers' Offset Corp. v City of N.Y., 14 NY2d 11, 22-23 [1964] [New York City commercial rent or occupancy tax is neither an ad valorem nor excise tax, nor tax applicable to intangible property encompassed within Article 16, § 3]). Moreover, we reject plaintiffs' proposed constitutional analysis that we find to be grounded in an atomized reading of section three's component parts, but lacking in the necessary consideration of those parts' interconnectedness and relationship to the tax system. Plaintiffs simply ignore that the component sentences work in harmony to proscribe physical location-based taxes on nonresidents' intangible personal property.

The first sentence of section three states that the domicile of a nonresidents' intangible personal property, not employed in business in New York, is the domicile of the owner of the property. This ensures that intangible personal property without an in-state business connection is treated as out-of-state property, even though the property is physically located within New York.

The second sentence of section three is a specific interdiction on ad valorem taxes, which are taxes assessed based on ownership and imposed according to the property's value. When

determining the coverage of this proscription, this Court has
previously adopted the general understanding that "[a]n ad
valorem property tax is always based upon ownership of property
and is payable regardless of whether the property is used or not"
(Ampco, 14 NY2d at 22, citing Matter of Guardian Life Ins. Co. v
Chapman, 302 NY 226, 238-239 [1951], and Powell v Gleason, 50
Ariz 542, 547-548 [1937], and Walla Walla v State, 197 Wash 357,
362 [1938]).  The second sentence of section three also prohibits
excise taxes "levied solely because of the ownership or
possession of the intangible property."  Together these clauses
preclude taxation based on physical ownership, possession, or
presence in New York State.

        The text of section three makes no mention and provides
no language supporting extending the prohibition on ad valorem
and ownership/property-based excise taxes to income taxes.  There
is simply no language in Article 16, § 3 that expressly or
implicitly constrains the state from imposing any other non-
location based taxes.  We have rejected a prior effort to
interpret the prohibition broadly to encompass other categories
of taxes.  Thus, in Ampco this Court declined to treat the New
York City Commercial Rent or Occupancy Tax Law as within the
ambit of Article 16, § 3 because the City's tax had none of the
characteristics of an ad valorem tax.  It was "not based merely
upon ownership or possession regardless of whether the property
is used or not; there [was] no provision for the determination or
assessment of the value of the property; nor [was] the tax

imposed according to the property's value" (Ampco, 14 NY2d at 22).  The same is true of the income tax at issue here.

The third sentence in section three declares that undistributed profits shall not be taxed.  This prohibition, however, is not implicated by the facts and legal issues involved in this appeal, and the plaintiffs do not suggest that it supports their reading of the constitutional text.

As should be clear from this analysis, we need look no further than the text of section three to reject plaintiffs' argument.  Nonetheless, because the history of Article 16, § 3 so clearly establishes that the plaintiffs' interpretation is at variance with the intended purpose of this section, we think the historical documents and the matters debated as revealed in these documents deserve brief mention.

At the time of section three's adoption, the drafters intended to "write into the Constitution a well-settled rule of domicile with respect to taxation," which generally treated the situs of intangible property as the owner's domicile (see Revised Record of the Constitutional Convention of the State of New York, vol. II, p. 1113 [1938]).  This rule, based on the doctrine of mobilia sequuntur personam, meaning the "movables follow the person," (see Matter of Brown, 274 NY 10, 17 [1937] op mod on denial of rearg, 274 NY 634 [1937] and revd sub nom. Graves v Elliott, 307 US 383 [1939]), is unambiguously reflected in the first sentence of section three.

The other concern addressed by the drafters in section

three was the impact of taxation of securities and stocks based solely on presence in New York State.  The drafters desired to attract and retain in the state monies and securities of nonresidents.  In order to make the state attractive the drafters constitutionally prohibited taxation of intangibles "until the [holders] employ them in business in the State," believing that this "tends to develop the financial supremacy of the City of New York" (see Revised Record of the Constitutional Convention of the State of New York, vol. II, p. 1113 [1938]).

The drafters further prohibited ad valorem taxes of intangibles, seeking to ensure the end of those property taxes because that system had "utterly failed" (id.), leading to its replacement in 1919 with an income tax (see L 1919 ch 627). The drafters' intent to attract stocks and securities is also evident from the prohibition on excise taxes solely based on possession and ownership.  This prohibition was included to prohibit taxation based on presence in the state until such time as the property was employed in business, or was transferred.

In response to questions about the anticipated coverage of section three as applied to the stock transfer tax, the Chair of the Committee on Taxation, which sponsored section three's addition to the Constitution in 1938, stated that,

> "[t]he stock transfer tax is an excise tax
> upon the transfer, and those are the very
> taxes which I submit...we are going to reap
> the benefit from, because if we can increase
> this intangible wealth from the other states
> you will be able to impose the transfer taxes
> which will bring you substantial revenues
> that you never calculated"

(see Revised Record of the Constitutional Convention of the State
of New York, vol. II, p. 1114 [1938]).  He further added,

>          "we want to make it impossible for the
>          Legislature itself, or for the Legislature to
>          delegate the right, to levy an excise tax on
>          the mere possession of the property.  In
>          other words, the property may enjoy that
>          privilege or it may be used for some purpose,
>          and then you can levy an excise tax on it if
>          and when it is used"

(id. at 1115).

The interpretation advocated by plaintiffs is not
merely rejected by this original history from the 1938
Constitutional Convention, but is also counter to the general
understanding of section three publicized during the 1967
Constitutional Convention.  According to the report on state
finance submitted by the Temporary State Commission on the
Constitutional Convention, section three was understood to
provide that "[a]d valorem taxes or excises on the ownership or
possession of intangible personal property are prohibited.
However, income from such property may be taxed" (State of NY
Temporary State Commission on the Constitutional Convention,
State Finance: Report 8 [March 24, 1967] at 37).

The 1938 and 1967 Constitutional Convention Committee
and Commission statements reveal that the intent of section three
is to prohibit taxation of intangible assets based merely on
their physical presence with the state, and to ensure a
proscription on the ad valorem taxation system as applied to
intangible personal property.  This was necessary to encourage

the importation and retention of nonresident wealth in the form of intangibles such as stocks.  However, the prohibition does not eliminate all taxation, as illustrated by the excise tax and transfer tax explicitly referenced approvingly by the drafters, and as further recognized by the comprehensive review conducted by the 1968 Commission of section three and other provisions.

Here, defendants assessed an income tax on the gains realized by plaintiffs from the JBS deemed asset sale.  It is not an ad valorem tax by definition or application, or an excise tax levied solely because of ownership or possession (Ampco, 14 NY2d at 22).  Instead, the tax is based on income generated by those intangibles which are derived from New York sources.  Therefore, the subject tax does not fall within the prohibition contained in section three.

To the extent plaintiffs argue that the deemed asset sale is a fiction of federal law, suggesting there are no real consequences associated with such fiction, that is simply a convenient but inaccurate characterization of the JBS transaction.  In reality "the § 338 (h) (10) 'fiction' simply allowed the parties to change the means by which the gain was realized and by whom" (Gen. Mills, Inc. v Commr. of Revenue, 440 Mass 154, 170 [2003]).  Nothing changes the fact that plaintiffs sold something of value and reaped the benefits from that sale. Article 16, § 3 in no way supports plaintiffs' attempts to avoid paying state taxes on those gains.

Accordingly, the order and judgment should be affirmed,

with costs.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order and judgment affirmed, with costs.  Opinion by Judge Rivera.
Chief Judge Lippman and Judges Read, Pigott, Abdus-Salaam, Stein
and Fahey concur.


Decided July 1, 2015